**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| MCI WORLDCOM NETWORK SERVICES, INC., a Delaware corporation, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>USCARRIER TELECOM, LLC, )<br>a Georgia limited liability company, )<br>)<br>Defendant. ) | Case No. 04-CIV-840P(C) |

## ORDER

Before the Court are Plainitiff MCI WorldCom's Motion for Partial Summary Judgment on its breach of contract claim against Defendant USCarrier, Defendant's Response in opposition thereto, and Plaintiff's Reply, as well as Defendant USCarrier's Motion for Summary Judgment, Plaintiff MCI WorldCom's Response in opposition thereto, and Defendant's Reply. In the interests of accuracy and efficiency, the Court treats these pleadings as cross-motions. For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment is GRANTED, and Defendant's Motion for Summary Judgment is DENIED.

## BACKGROUND

From the undisputed facts in this case, the Court finds as follows:

MCI WorldCom owns and operates an international fiber-optic telecommunications network. As part of its business, MCI WorldCom sells telecommunications capacity on its network on both a wholesale and retail basis. At the wholesale level, MCI WorldCom sells blocks of telecommunications capacity to "resellers" such as USCarrier, who in turn sell that telecommunications capacity to third parties. MCI WorldCom and USCarrier entered into a

Telecommunications Services Agreement (TSA) on August 18, 2000 to facilitate precisely this type of exchange.

Under the TSA, services were to be provided for an initial term of twenty-four (24) months, and were to continue uninterrupted on a month-to-month basis, subject to termination by either party upon thirty (30) days written notice. MCI WorldCom billed USCarrier on a monthly basis for the telecommunications services purchased by USCarrier. USCarrier agreed to pay specified rates and charges for the services, subject to MCI WorldCom's right to modify such charges upon sixty (60) days prior written notice to USCarrier. USCarrier also agreed to maintain a monthly revenue of $100,000.00 and, in the event that USCarrier failed to meet such requirement, USCarrier agreed to pay the difference between its actual revenue and the required minimum. The TSA also specified a billing dispute procedure in the event that USCarrier contested any amounts billed by MCI WorldCom.

The parties operated under the original terms of the TSA without incident from August 23, 2000 until October 9, 2002. On October 9, 2002, MCI WorldCom gave written notice to USCarrier that the rate for certain services would increase effective December 9, 2002. USCarrier notified its resale customers of the rate change on November 5, 2002. Due to an inadvertent error, the rate was not changed in MCI WorldCom's billing system, and the increased rate was therefore not reflected on USCarrier's invoices until May 2003. USCarrier paid the interim invoices at the old rate, which was the rate that appeared on the invoices, and did not notify MCI WorldCom of the billing error. When MCI WorldCom discovered its error, it included charges for the under-billed services from December 9, 2002 through March 2003, in addition to the charges at the new rate for April 2003, on USCarrier's May 2003 invoice.

USCarrier refused to pay the back-billed amounts.

In February 2003, USCarrier provided written notice of its intent to cancel the TSA effective April 7, 2003. On March 18, 2003, USCarrier revised the effective cancellation date to May 15, 2003. On USCarrier's June 2003 invoice, MCI WorldCom charged USCarrier the difference between the monthly minimum revenue of $100,000.00 and the actual usage charge of $852.13 for the month of May. USCarrier refused to pay this amount.

MCI WorldCom now seeks to recover (1) the back-billed charges of $544,014.26, (2) the monthly minimum revenue payment for May 2003 of $99.147.87, and (3) miscellaneous unpaid – and allegedly undisputed – charges of $18,311.83. USCarrier alleges that MCI WorldCom breached the TSA, such that USCarrier is not liable for any of these charges. USCarrier also claims to be entitled to judgment on its defense of recoupment. The parties agree that the terms of the TSA are unambiguous, and that the express terms of the contract govern this dispute. These issues are now before the Court in the parties' cross-motions for summary judgment.

## DISCUSSION

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. Id. at 249. In making the summary judgment determination, the Court examines the factual record

and draws reasonable inferences therefrom in the light most favorable to the non-moving party. Simms v. Oklahoma, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion.

Both parties here seek summary judgment as a matter of law based on the express terms of the TSA. Although the parties disagree in their interpretation of the TSA, "the mere fact that the parties disagree about the meaning of a contract or argue for a different construction does not necessarily make the agreement ambiguous." Gamble, Simmons & Co. v. Kerr McGee Corp., 175 F.3d 762, 767 (10th Cir. 1999). In other words, an ambiguity is not "manufactured" simply because the parties claim alternative interpretations. Id. Instead, the determination of whether a contract is ambiguous is a question of law. Elliot Indus. v. BP Am. Prod. Co., 407 F.3d 1091, 1108 (10th Cir. 2005). A contract is unambiguous if its terms are reasonably and fairly susceptible to only one construction. *See* id. Once a contract is determined to be unambiguous, its interpretation is likewise a question of law. *See* Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc., 51 F.3d 910, 914 (10th Cir. 1995).

Upon a careful review of the TSA at issue here, the Court finds its material terms to be clear and unambiguous. The Court therefore turns its attention to the specific issues raised by the parties.

### I. The Back-Billed Charges

#### A. **MCI WorldCom was entitled to back-bill USCarrier for the undercharged amounts.**

The parties agree that paragraphs 5(a) and 5(d) of the TSA govern their dispute as to the back-billed charges, but disagree in their interpretation of those paragraphs. According to MCI WorldCom, although it initially erred by failing to charge the new rate promptly on the effective

date, it properly corrected the error on the May 2003 invoice, such that USCarrier's failure to pay the back-billed amount constitutes a breach of the TSA. In USCarrier's view, MCI WorldCom breached the TSA by failing to bill the new rate in a timely and accurate fashion in the first instance, such that USCarrier is not liable for the back-billed amount.

USCarrier also takes issue with MCI WorldCom's assertion that "USCarrier continued to purchase the Intrastate Services from MCI subject to the Adjusted Rate" during the period in which USCarrier's invoices did not reflect the new rate. Although this semantic argument is perhaps irrelevant to the resolution of this dispute under the express terms of the TSA, the Court acknowledges a certain amount of common sense in USCarrier's approach. Arguably, USCarrier could not <u>purchase</u> the services at the adjusted rate unless and until it was <u>billed</u> for the services at that rate, even though it had agreed <u>in theory</u> to the new rate by acknowledging MCI WorldCom's notice of the increase.[1] Under this interpretation, USCarrier did not start to purchase services at the adjusted rate until it was billed at that rate in May 2003. USCarrier therefore argues that MCI WorldCom forfeited its ability to collect the adjusted rate because USCarrier already purchased the services according to the rate listed on the monthly invoice.

At this point, however, the express terms of the TSA come into play. The relevant paragraph states in pertinent part:

5. <u>Charges and Payment Terms</u>.

---

[1] In the retail setting, an analogous transaction would be for a consumer to select an item off the shelf, where the price was clearly marked $5.00. When the cashier scans the item for purchase, however, the price inadvertently "rings up" as $4.00. The consumer pays $4.00 and takes the item home. Could the consumer then return the item and claim a refund of $5.00, based on price listed on the shelf, instead of the erroneous – but actual – "purchase" price of $4.00? Or could the store come to the consumer's home and demand payment of the additional $1.00, on the theory that the consumer "knew" that the "real" price was $5.00?

> (A) <u>Payment</u>   MCI Worldcom billings for Switched Services hereunder are made on a monthly basis (or such other basis as may be mutually agreed to by the parties) following Start of Service . . . . Customer will pay all undisputed charges relative to each MCI WorldCom invoice for Switched Services within thirty (30) days of the invoice date set forth on each MCI WorldCom invoice to Customer ("Due Date").  If payment is not received by MCI WorldCom on or before the Due Date, Customer shall also pay a late fee in the amount of the lesser of one and one-half percent (1½ %) of the unpaid balance . . . .

USCarrier argues that, because paragraph 5(A) of the TSA expressly provides for monthly billing, MCI WorldCom is not entitled to correct its billing errors from previous months on a later invoice. For its part, MCI WorldCom claims that paragraph 5(A) only governs payment dates – that is, that USCarrier must make payment within thirty (30) days of MCI WorldCom's invoice date or be subject to late fees – and that the actual content of the invoices is not contemplated. Thus, because the billing errors were charged as a separate items on the May 2003 invoice, MCI WorldCom argues that they were properly billed and due for payment thirty (30) days after the invoice date, just like any other monthly charges. Given the fact that paragraph 5(a) is titled "Payment," and in accordance with the plain meaning of the terms therein, the Court finds that MCI WorldCom's construction is accurate, and that the TSA did not contemplate the content of the monthly bills, but merely the fact that billing would be on a monthly basis, unless otherwise agreed by the parties.

In fact, the parties did not specifically agree to any other basis for billing the undercharged amounts at issue here, nor did they include any terms in the TSA for correcting billing errors in general. However, a silent contract is not necessarily an ambiguous contract, nor an unenforceable one. <u>Lyon Dev. Co. v. Business Men's Assurance Co.</u>, 76 F.3d 1118, 1124 (10th Cir. 1996). Instead, the Court may imply a right or obligation with respect to which the contract is silent if "a consideration of the whole of its parts admits of no other reasonable

construction," United States v. Nickel, 243 F.2d 924, 927 (10th Cir. 1957), or decline to do so if additional terms are unnecessary.

In this regard, paragraph 5(c) of the TSA, titled "Modification of Charges" provides some additional insight:

> MCI WorldCom reserves the right to . . . modify charges for particular Switched Services . . . upon not less than sixty (60) days prior notice to Customer, which notice will state the effective date for the charge modification. In the event MCI WorldCom notifies Customer of . . . an increase in the charges, Customer may terminate this Agreement without incurring a cancellation charge (other than payment for Services provided by MCI WorldCom up through the effective date of cancellation) only with respect to the Switched Service(s) affected by the increase in charges. In order to cancel such Switched Service(s), Customer must notify MCI WorldCom in writing, at least thirty (30) days prior to the effective date of the increase in charges. In the event Customer cancels its subscription to a particular Switched Service as described in this Subsection 5(c), MCI WorldCom and Customer agree to negotiate in good faith concerning Customer's minimum monthly commitment, if any . . . .

The parties do not dispute the fact that MCI WorldCom was entitled to increase its rates pursuant to these terms, and that USCarrier was on notice of an increase to be effective December 9, 2002. Paragraph 5(c) does not state that the new rate must be invoiced in order to be effective, but rather, that the rate will take effect on a certain date. USCarrier did not contest the rate increase, or cancel its service as provided in paragraph 5(c), but rather acquiesced to continuing the contract under the new terms, which were to become effective on December 9, 2002. Construing the contract as a whole, as well as the actions of the parties as described herein, the Court finds that MCI WorldCom was entitled to back-bill USCarrier for the undercharged amounts.

### B.    USCarrier was obligated to pay the back-billed charges.

Upon receipt of the May 2003 invoice, which contained the back-billed amounts,

USCarrier provided proper notice to MCI WorldCom that it disuputed such charge of $544,014.26.  Seemingly, USCarrier's argument was not – and is not – that the adjusted amounts were unjustified; indeed, USCarrier had already acquiesced to the new terms.  Rather, USCarrier argues that these charges were improperly billed all at once, rather than on a month-to-month basis, in breach of the TSA.  MCI WorldCom denied USCarrier's dispute of the back-billed amounts on October 15, 2003.  USCarrier now further claims that MCI WorldCom was required to communicate its decision regarding the dispute within 60 days, and that its delay in doing so constitutes a breach of the TSA.

> The relevant section of the TSA reads:
>
> (D) <u>Billing Disputes</u>   Notwithstanding the foregoing, amounts reasonably disputed by Customer (along with late fees attributable to such amounts) shall apply but shall not be due and payable for a period of sixty (60) days following the Due Date therefor, provided Customer: (i) pays all undisputed charges on or before the Due Date, (ii) presents a written statement and supporting documentation of any billing discrepancies to MCI WorldCom in reasonable detail on or before the Due Date of the invoice in question, and (iii) negotiates in good faith with MCI WorldCom for the purpose of resolving such dispute within said sixty (60) day period.  In the event such dispute is mutually agreed upon and resolved in favor of MCI WorldCom, Customer agrees to pay MCI WorldCom the disputed amounts together with any applicable late fees within ten (10) days of the resolution (the "Alternate Due Date").  In the event such dispute is mutually agreed upon and resolved in favor of Customer, Customer will receive a credit for the disputed charges in question and the applicable late fees.  **In the event MCI WorldCom has responded to Customer's dispute in writing and the parties fail to mutually resolve or settle the dispute within such sixty (60) day period (unless MCI WorldCom has agreed in writing to extend such period) all disputed amounts together with late fees shall become due and payable, and this provision shall not be construed to prevent Customer from pursuing any available legal remedies.**  MCI WorldCom shall not be obligated to consider any Customer notice of billing discrepancies which are received by MCI WorldCom more than sixty (60) days following the Due Date of the invoice in question.

Thus, according to the plain language of the TSA, USCarrier cannot be expected to pay unless

(1) the parties negotiated but failed to settle the dispute within the 60-day window, **and** (2) MCI WorldCom "responded" in writing to USCarrier's dispute. Both conditions must be satisfied before USCarrier's obligation to pay is triggered. Whether the 60-day window applies to each prong is, however, ambiguous.

To meet the first condition, the parties must negotiate in good faith within the 60-day window. The TSA actually puts the affirmative burden to negotiate on USCarrier as an initial step in the billing dispute process. Although neither party presents any evidence of negotiations, the parties obviously did not mutually resolve or settle the dispute within 60 days. The question of whether the parties actually negotiated is therefore immaterial. Because the parties did not settle their dispute within 60 days, the first condition is met.

The second prong requires MCI WorldCom to "respond" in writing to USCarrier's dispute. MCI WorldCom admits that it has "substantial incentive" to respond to USCarrier and resolve the dispute during the 60-day window. [Pltf's Mtn. at 16.] Indeed, the Court fails to see how the parties could possibly "negotiate" within the 60-day window, as is clearly required to satisfy the first prong, if MCI WorldCom does not "respond" – whether such response be an initial acknowledgment or a final decision or something in between – within that time frame. However, the TSA clearly does not require MCI WorldCom to "decide" within 60 days. Although the Court finds the TSA ambiguous as to whether or not MCI WorldCom must "respond" within 60 days, and the parties offer no evidence on this point, such condition is immaterial to the resolution of this dispute. Here, the parties never resolved the dispute. Once MCI WorldCom denied USCarrier's disputed claim, USCarrier was obligated to pay the disputed amount and resort to legal remedies in lieu of contractual remedies. The TSA simply does not

contain any other option in the event of an ongoing dispute. The Court therefore finds that USCarrier is liable for the back-billed charges of $544,014.26, subject to its defense of recoupment.

### C.      Recoupment

Recoupment is the defendant's right to a reduction in plaintiff's damages for breach of contract due to plaintiff's own failure to comply with cross-obligations or independent covenants under the same contract. *See* Bank of Oklahoma, N.A. v. Briscoe, 911 P.2d 311, 318 (Okla. Ct. App. 1995). A recoupment claim must (1) arise from the same transaction or occurrence as the plaintiff's suit, (2) seek the same type of relief, and (3) not exceed the amount of plaintiff's claim. FDIC v. Hulsey, 22 F.3d 1472, 1487 (10th Cir. 1994). USCarrier asserts that recoupment is appropriate here because (1) MCI WorldCom failed to bill the adjusted rate in a timely and accurate manner; (2) MCI WorldCom failed to respond to USCarrier's dispute within 60 days; and (3) such failures by MCI WorldCom jeopardized USCarrier's revenue collection efforts because USCarrier relies on MCI WorldCom's bills to generate its own invoices. Because recoupment is an equitable doctrine, the Court may consider the contract as a whole, regard things done and stipulated to be done on each side as the consideration for things done and stipulated to be done on the other, sum up the grievances on both sides, and strike an appropriate balance. *See* In re Comm'l Fin. Svcs., Inc., 251 B.R. 397, 405 (N.D. Okla. 2000); *see also* Atlas Auto Fin. Co. v. Atkins, 53 S.E.2d 171, 174 (1949).

Recoupment may be appropriate in contract cases where, for some reason, the plaintiff is liable to the defendant under the same contract. *See* Atlas Auto Fin. Co., 53 S.E.2d at 174. However, USCarrier's arguments fail on this point. First, while MCI WorldCom admits that its

inadvertent billing error resulted in the adjusted rate going unbilled for several months prior to MCI WorldCom's discovery of its system error, such error does not constitute a breach of the TSA. MCI WorldCom was therefore entitled to back-bill USCarrier for the under-billed amount. Second, the Court does not reach the issue of whether MCI WorldCom's failure to respond to USCarrier's dispute within sixty (60) days constitutes a breach of the TSA because the Court finds as a matter of law that MCI WorldCom need not **decide** its disputes within that time frame, as argued by USCarrier. Finally, although USCarrier does rely on MCI WorldCom's bills to generate its own invoices, in this case, USCarrier had every opportunity to update its billing, based on the proper notice of the rate change provided by MCI WorldCom and acknowledged by USCarrier. Indeed, USCarrier gave its customers notice of the rate increase before the effective date. By failing to invoice its own customers at the adjusted rate upon receiving notice of same, USCarrier essentially committed the same error as MCI WorldCom. Thus, for USCarrier to argue now that it cannot recover the adjusted rate from its customers is both irrelevant and disingenuous. Defendant USCarrier's recoupment claim as set forth in its Motion for Summary judgment is therefore DENIED, and Plaintiff MCI WorldCom's Motion for Partial Summary is GRANTED on the issue of the back-billed amount of $544,014.26.

## II. The Monthly Minimum Revenue Payment for May 2003

MCI WorldCom also seeks to recover the balance of the minimum revenue payment for May 2003 in the amount of $99.147.87. USCarrier disputes this charge on the grounds that the "industry standard" permits a "ramp down" period once service has been cancelled during which the monthly minimum is no longer applicable. The Court notes, however, that the "industry standard" may only be used to supplement or interpret an **ambiguous** contract; it cannot replace

11

clear contract language. *See, e.g.,* Jackson Materials Co. v. Grand River Dam Auth., 170 P.2d 552, 557 (Okla. 1945)("Evidence of custom and usage is not admissible to vary, add to, or contradict the terms of a plain and definite contract or impose a duty or obligation upon a party to a contract not incorporated therein where such duty or obligation is expressly or impliedly excluded by the terms of the contract."). Instead, the Court must construe an unambiguous contract based solely upon the language contained within the four corners of the agreement. First Am. Kickapoo Operations, LLC v. Multimedia Games, Inc., 412 F.3d 111166, 1172 (10th Cir. 2005).  Just because enforcing the contract will work a hardship on one of the parties does not mean the contract is ambiguous.  Gamble, Simmons & Co., 175 F.3d at 767.  "The dispositive factor . . . is not whether the parties disagree or inequity results, but whether an examination of the entire agreement reveals more than one reasonable interpretation." Id.

Here, the contract clearly and unambiguously provides that the monthly minimum revenue payment must be made.  Paragraph 5(c) of the TSA states that if "Customer cancels its subscription to a particular Switched Service as described in this Subsection 5(c), MCI WorldCom and Customer agree to negotiate in good faith concerning Customer's minimum monthly commitment."  However, such re-negotiation is **not** contemplated anywhere else in the TSA.  The Court recognizes a strong presumption against adding terms which could have easily been included in the contract but were not.  *See* Rush Presbyterian-St. Lukes Med. Ctr. v. Prudential Ins. Co. of Am., 2004 U.S. Dist. LEXIS 5187 (D. Ill. March 30, 2004).  The fact that re-negotiation was specifically discussed in one clause makes its absence from the other clause appear all the more intentional and meaningful.  In fact, the TSA specifically provides that "[u]pon expiration of the Service Term, the Switched Services in question will continue to be

provided pursuant to the same terms and conditions as are then in effect . . . ."  Moreover, with respect to the monthly minimum, the TSA recites, "It is agreed that MCI WorldCom's damages will be difficult or impossible to ascertain in the event Customer fails to maintain Customer's Minimum Revenue Commitment.  The provision for a Deficiency Charge . . . is intended, therefore, to establish liquidated damages . . . and is not intended as a penalty."  Given these terms – both those specifically included and that specifically excluded – the Court finds that the monthly minimum revenue payment is due and owing for the month of May 2003.  Plaintiff MCI WorldCom's Motion for Partial Summary Judgment is therefore GRANTED on the issue of the monthly minimum revenue payment, and Defendant USCarrier's contrary Motion for Summary Judgment is DENIED.

### III.  The Miscellaneous Charges of $18,311.83

Finally, MCI WorldCom seeks payment of miscellaneous charges in the amount of $18,311.83, which it characterizes as "undisputed."  USCarrier denies this characterization, but admits that the disputed charges first appeared on the June 2003 invoice, but were not immediately discovered.  Indeed, USCarrier did not submit Billing Dispute Notification Forms for this amount until November 26, 2003.

According to the TSA, USCarrier agreed to "pay[] all undisputed charges on or before the Due Date [and] present[] a written statement and supporting documentation of any billing discrepancies to MCI WorldCom in reasonable detail **on or before the Due Date** of the invoice in question . . . ."  Moreover, the TSA expressly provides that "MCI WorldCom shall not be obligated to consider any Customer notice of billing discrepancies which are received by MCI WorldCom more than sixty (60) days following the Due Date of the invoice in question."  By

failing to comply with the 60-day deadline set forth in the TSA, USCarrier effectively waived its rights to dispute these charges. Plaintiff MCI WorldCom is therefore entitled to summary judgment on this issue and its Motion is GRANTED, while Defendant USCarrier's Motion for Summary Judgment on this point is DENIED.

## **CONCLUSION**

For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment is GRANTED, and Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED this 19th day of December 2005.

*/s/ James H. Payne*
James H. Payne
United States District Judge
Northern District of Oklahoma